UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JAMES GILBERT                              CIVIL ACTION NO. 05-0468

VERSUS                                     JUDGE STAGG

PHELPS CORRECTIONAL CENTER                 MAGISTRATE JUDGE HORNSBY

### REPORT AND RECOMMENDATION

**Introduction**

James Gilbert ("Petitioner") was charged with two counts of aggravated assault upon a peace officer with a firearm, stemming from an incident during which Petitioner pointed a shotgun at officers of the Louisiana Wildlife & Fisheries Department who came to his home to investigate after one of them heard a gunshot in the area. A Sabine Parish jury of six persons convicted Petitioner of both counts. The trial judge, noting Petitioner's extensive criminal history and the life-threatening situation that Petitioner created, imposed the maximum 10-year sentence on each count, to run concurrently.

Petitioner, represented by the Louisiana Appellate Project, filed a direct appeal and raised arguments regarding: (1) sufficiency of the evidence, (2) failure to instruct the jury on an element of the offense, and (3) excessiveness of the sentences. Tr. 311. The Third Circuit Court of Appeal affirmed the convictions and sentences. Tr. 1 Counsel for Petitioner filed an application to the Supreme Court of Louisiana for a discretionary writ of review. Counsel employed the time-honored and reasonable appellate strategy of selecting what she

believed to be the most meritorious issue (the jury instruction issue) and focusing her efforts and the court's attention on that issue. The Supreme Court of Louisiana nonetheless denied the application without comment. Tr. 259.

Petitioner then filed this federal habeas petition and presented the three issues raised on direct appeal plus a claim of ineffective assistance of counsel stemming from a lack of objection to the jury instructions and other perceived shortcomings of trial counsel. This court pointed out to Petitioner that his petition appeared to include unexhausted claims.

An application for a writ of habeas corpus "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The requirement is satisfied if the federal issue has "once been properly presented to the highest court of the state" either on direct appeal or through a post-conviction application. Sones v. Hargett, 61 F.3d 410, 415 (5th Cir. 1995). That includes presenting the issue in a petition for certiorari to state's high court, even if that court affords only discretionary review. O'Sullivan v. Boerckel, 119 S.Ct. 1728 (1999).

The court afforded Petitioner an opportunity to establish which of his claims were exhausted. After the court determined that only the jury instruction issue that was presented to the state's high court had been properly exhausted, the court advised Petitioner in detail of his procedural options. Petitioner elected to withdraw his unexhausted claims and proceed with the single claim based on the defective jury instruction. Doc. 10. It is recommended, for the reasons set forth below, that habeas relief be denied.

**The Issue**

Petitioner was charged with two counts of aggravated assault upon a peace officer with a firearm, a violation of La.R.S. 14:37.2. That statute provided, at the time of the 2002 encounter that lead to the charges and the 2003 trial: "(A) Aggravated assault upon a peace officer with a firearm is an assault committed upon a peace officer *who is acting in the course and scope of his duties* with a firearm." (emphasis added). The italicized "course and scope" language was added by 2001 legislation, but it was omitted from the instructions given to Petitioner's jury. See Tr. 107-08. Trial counsel did not object to the omission, but the issue was raised on direct appeal. The appellate court found that the error was harmless. Petitioner urges that the error requires that his convictions be vacated.

**Federal Habeas Standard of Review**

Failure to properly instruct a jury on the elements of a crime may constitute a due process violation, but the Supreme Court has "often held that the trial court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis." Mitchell v. Esparza, 124 S.Ct. 7, 11 (2003). See also Neder v. U.S., 119 S.Ct. 1827 (1999) (jury instruction that omits element of offense is subject to harmless-error analysis).

There has been some question as to the proper harmless-error standard in certain habeas cases, but the Supreme Court clarified matters in Fry v. Pliler, 127 S.Ct. 2321 (2007) when it stated: "We hold that in § 2254 proceedings a court must assess the prejudicial

impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht [113 S.Ct. 1710 (1993)], whether or not the state appellate court recognized the error and reviewed for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [87 S.Ct. 824 1967]". Id. at 2328.

**Summary of the Evidence**

### A. Testimony of Agent Dewil

Joe Dewil, Jr. testified that he is a commissioned officer of the Louisiana Department of Wildlife and Fisheries. As such, he is authorized to enforce the game and fish laws of the state, as well as any other state laws. He explained that he works a shift schedule, but he is subject to answering calls at any time, and he is allowed to investigate at any time he believes a wrong has been done. Agent Dewil had just completed a shift and arrived at his home, at about 9:30 p.m., when he heard a shot fired in the rural area near his home. Agent Dewil called his supervisor, Lt. Jimmy Day, who was out working at the time. Lt. Day was 10 or 12 miles from the area, so Agent Dewil said that he would go ahead and respond to the complaint since he was closer, but he asked Lt. Day to come to the area. Lt. Day told Agent Dewil to proceed to check out the gunshot.

Agent Dewil put his duty shirt and gun belt back on, got in his decal-marked truck issued by the Department (equipped with strobe lights and siren), and "went 10-8" (meaning he was on duty). Dewil drove to Petitioner's residence, which was about 1.5 or 2 miles from Agent Dewil's home. Dewil described the area as surrounded by woods and pasture, with

several hunting leases in the area. Common game such as deer, turkey and squirrel were not in season at the time, and it was not lawful to hunt any kind of game at that time of night except racoons.

Agent Dewil pulled into Petitioner's driveway. Based on his "prior experience with [Petitioner]," Dewil said he wanted to let Petitioner know he was there so he tripped his blue lights and let them flash a couple of times, turned them off, got out of his truck, and began walking toward the trailer. He picked his way through scrap metal and other items stacked around the yard, and the "at least 30" dogs that Petitioner kept were "all over the place" and barking. Petitioner came to the door, and Agent Dewil "hollered at him" and told him who he was. Because the two men knew each other, Dewil just said, "Rodney, this is Joe." Petitioner came to the door with a shotgun in his hands. Agent Dewil said that it was too dark for Petitioner to see his marked truck from the door, but Dewil was in full uniform (just as he wore in court), and Petitioner knew Dewil because the two had experienced "several encounters" in the past.

Agent Dewil asked Petitioner about the gunshot he had heard, and Petitioner denied that he fired it. Dewil said that he could tell Petitioner had been drinking. He repeated his question. Petitioner admitted that he had fired a gun a few minutes earlier. At this point, Petitioner was pointing the shotgun up in the air, while standing on the steps just outside his home. Agent Dewil was standing on the ground, within the light that was shining through

the open door of the home, looking up at Petitioner. It was light enough for Agent Dewil to see puppies and other items in the area without using a flashlight.

Petitioner claimed that his dogs had been barking, and he fired to scare away whatever caused them to bark. Agent Dewil counseled Petitioner against shooting in the area because there were homes nearby and there had been complaints in the past, but Petitioner denied that there had been complaints and argued with Dewil.

Lt. Day soon arrived, also in a marked truck, and fully uniformed, and he walked to where the men were talking. Agent Dewil introduced Day as his supervisor. Each agent had a badge on his chest, a radio microphone clipped to his shoulder, and was armed with a sidearm. Agent Dewil filled in Lt. Day about the earlier events. Lt. Day then began talking to Petitioner about the wisdom of shooting in the area, noting that officers such as Agent Dewil would have to come and investigate if they hear a shot.

Petitioner said something to the effect that he would shoot whatever he wanted around there. Lt. Day took a step toward where Agent Dewil was standing and, about that time, Petitioner put his shotgun to his shoulder and aimed it toward Lt. Day's head. Agent Dewil drew his sidearm and started yelling at Petitioner to put down the gun. Petitioner made comments that he had nothing to live for and did not care if he died. The agents were only eight or ten feet from Petitioner during this encounter, and Agent Dewil feared that if he shot Petitioner, Petitioner would nonetheless fire the shotgun at Lt. Day. Dewil said he feared that if Petitioner shot Lt. Day, he would be next. After perhaps 15 to 30 seconds, Petitioner

slowly raised the gun where it was pointed above Day's head. Agent Dewil kept talking to Petitioner, who eventually lowered the gun and leaned it against the trailer door, but Petitioner kept his hand on the shotgun. The agents backed away from the home and ordered Petitioner to step into the yard. When he did, Agent Dewil ran behind him and grabbed the weapon, which was a semi-automatic 12-gauge shotgun. Tr. 142-64.

### B. Testimony of Lt. Day

Lt. Day testified that he arrived, parked, and walked through the yard where Agent Dewil and Petitioner were talking. Day walked up beside Dewil, and he stood behind a fence or other object that came up to his mid-chest area. He listened to the conversation, and then he talked to Petitioner, who paid little attention to him. Day stepped from behind the fence or cage toward Agent Dewil, where there was more light coming from the doorway of Petitioner's trailer. As Day took the step, Petitioner brought the shotgun up and pointed it at Day's head. Day and Dewil both drew their pistols. Day described the standoff in a manner similar to how Dewil described it, and he also estimated that it lasted about 30 seconds. Day was "positive" that Petitioner had his finger on the trigger of the weapon during the standoff. Tr. 187-201.

### C. Testimony of Petitioner

Petitioner testified that he had been experiencing a problem with coyotes coming around his house and exciting his dogs. He would fire an old blackpowder .44 pistol in the air to scare away the animals. It was that pistol that had been fired earlier that evening.

Petitioner testified that he had gone to bed on the night of the incident. He believes the agents arrived at his home at about the same time. His dogs were barking, and he went outside with his shotgun. A man (Agent Dewil) was behind a tree in the front yard and was shining a flashlight in Petitioner's face. Petitioner was yelling at his dogs to shut up, and trying to tell the man to lower the flashlight so Petitioner could see who was there. At about that time, according to Petitioner, Lt. Day yelled that he could not "talk to him like that" and approached Petitioner at a fast rate. Petitioner said that he instinctively brought his shotgun up and told the man to stop and identify himself. Agent Dewil said that it was his supervisor, Lt. Day, and Petitioner put his shotgun down. Petitioner testified that he held the gun on Day just long enough for Day to shine his light down on his clothing so that Petitioner could see that he was a wildlife agent. Petitioner testified that the conversation about the shot being fired earlier happened after this encounter. Petitioner admitted that he knew Agent Dewil and that he was a Wildlife and Fisheries agent.

Petitioner admitted on direct examination that he had a prior conviction related to a car theft. On cross examination, he also admitted to two escape convictions, a felony theft conviction, several counts of assault, and providing false information to an officer. Tr. 206-27.

**Analysis and Conclusion**

The state appellate court noted that trial counsel had not objected to the omission of the "course and scope of duty" element from the jury instructions, but it nonetheless

addressed what the state conceded was an error. The appellate court reviewed a number of Louisiana decisions that had conducted harmless error analyses following erroneous jury instructions, and it quoted at length from Neder, where the Supreme Court assessed the harmlessness of the omission of an element from an instruction. After that discussion, but without specifically articulating the harmless error standard that it employed, the appellate court concluded that the omission was subject to harmless error analysis and that the error was harmless because the verdict was supported by the evidence. Tr. 211-15.

On direct appeal, when faced with a constitutional violation, a court must reverse a judgment unless the constitutional error is harmless beyond a reasonable doubt. Chapman, supra. As explained in Fry v. Pliler, that standard does not apply on federal habeas review of a state court conviction. Rather, the federal court is to apply the less onerous standard from Brecht that asks whether the error had a substantial and injurious effect or influence in determining the jury's verdict.

The error in omitting the "course and scope of duty" instruction in this case was harmless. The jury plainly accepted the testimony of the two agents over that offered by Petitioner. The agents offered testimony that they were uniformed, armed, on duty, and that Petitioner was abundantly aware that they were acting in the course and scope of their duties. Petitioner even admitted that he recognized Agent Dewil's voice, and he knew that Agent Dewil was a wildlife agent, but he nonetheless insisted that the agents show themselves to be identified. After reviewing the evidence, and considering the verdict that was returned,

the court finds no objective basis to believe that the absence of the "course and scope" instruction rendered a substantial or injurious effect on the verdict. It is a virtual certainty that, had the instruction been given, the jury would have returned identical guilty verdicts.

Accordingly;

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be dismissed with prejudice.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

      THUS DONE AND SIGNED in Shreveport, Louisiana, this 31st day of January, 2008.

                                                       MARK L. HORNSBY
                                         UNITED STATES MAGISTRATE JUDGE